Case number 243838, Pamela Pirl et al. v. Rice Drilling D LLC, or arguments not to exceed 15 minutes per side. Mr. Onest, you may proceed for the appellant. May it please the court, I would like to reserve five minutes for rebuttal, your honors. My name is Matthew Onest, and I'm an attorney for the appellant in this case, Shannon Pirl and his mother, Pamela Pirl. Your honors, the Pirls have owned and operated a family cattle business on their property for decades. It started with the father, Joseph Pirl, who's now deceased. Him and his wife, Pamela, ran this for a number of years. From the very get-go, their son, Shannon Pirl, was also involved in that business, although he had other work to do. But as his father, Joseph, got older and couldn't take that responsibility as much as he could before, Shannon got more involved. Now, like many farmers in Ohio, particularly in the southeastern Ohio area, the Pirls leased their oil and gas rights for production purposes. And the original lease had limitations on the number of acres that the producer could come in and use the surface of the property. It limited it, I believe, to 10. Few years after that, they were approached by what is, I'll call EQT throughout this, your honors. It was originally called Statoil, became Equinor, and now this asset was bought by EQT. They were originally approached by Statoil to put a surface site, so an actual surface location on this property with equipment to actually physically drill these oil and gas wells into the ground and to produce oil and gas. And they approached them for what's called a surface use agreement. And the reason they did that is that there were the 10-acre limitation in the original lease, and they wanted to use more. So the parties negotiated that, and modifications were made, and eventually there is a surface use agreement agreed to and signed by the parties. And that is the sole contract that governs what is now EQT's surface use, what it can do, how it needs to maintain the surface, what it can and cannot install. Now, critically, there is no agreement, there's no provision within that surface use agreement or any other contract, which says that the Pirls, by entering into this contract, were giving up their decades-long cattle business. They were still intending to run this business on this property. Now, ultimately, Shannon succeeded his father in that business, and this actually started to occur before Joseph passed away. He was, being Shannon, was actively involved in the negotiations with his parents throughout this process to negotiate the surface use agreement. What we're principally here today about, though, is Equinor, and now EQT, put a fence around this entire surface site, the roughly 12-plus, almost 13-acres worth of surface. They fenced the outer portion of it. And we don't believe that the surface use agreement allows that type of fencing, because what it does is it effectively cuts off the Pirls' ability to reasonably use that, certainly that portion, and to reasonably traverse cattle across their property, which they always intended to do. Does your argument counsel your belief about what it allows and what it doesn't allow rely necessarily on this plat, or the part of the contract that was for informational purposes only? In part, Your Honor. Yes. That is one part. It's not the only part. So there's many parts that we believe lead us to that position. But yes, I would agree. Exhibit A to it, which does say, for informational purposes only, but is also specifically incorporated by reference. In Ohio, when we specifically incorporate, by reference, documents into contracts, they become part of the contract. And then the court has a duty to harmonize all provisions, which would include those that are still by reference. Do you have any cases that would support your assertion that because it's incorporated into the contract, that that somehow reads out whatever significance there is to the phrase for information purposes? You know, Your Honor, I don't believe we located a case that specifically discussed the fact what happens when you incorporate by reference, and then you also have that type of information. I don't believe we ever located. I'm not aware that we were able to locate something that had that phrase in this type. So if you don't have any authority for that, I mean, why does the argument even really make any sense? If you incorporate it by reference, so that at least it has some sort of a role, but then you go on to describe what that role is for informational purposes only, why do we read out, as I think you do in your briefs, why do we read out the for informational purposes only just because it was incorporated? Well, no, I'm not saying that you read that out. What I'm saying is what the district court did is they said, well, that means it means nothing. That you look at it, but it has no bearing whatsoever. I think that's too far.  So what does it mean? Okay. So informational is derived, it's defined, or it's derived from the term information. Information is knowledge obtained, and we have definitions provided in our brief. Information is knowledge obtained from investigation, study, or instruction. Now knowledge is defined, and this is by Miriam Webster's, as the fact or condition of knowing something with familiarity gained through experience or association. When you take the definitions of the word used, it is knowledge or facts that you glean. The only reason they attach that and put that is it is information. Fact or condition of knowing something with familiarity gained through experience or association, it is supposed to be looked upon. Now I guess I hear all of that, and just to follow up on what Judge McKee was asking, without this Exhibit A, am I wrong to say that the agreement allowed the opposing party to construct this fence and to construct or maintain these topsoil piles the ways that they did? No. Okay. Why not? The granting clause, Your Honor. The granting clause in the Surface Use Agreement gives EQT the right of ingress and egress across this property, not the exclusive right. So it is not exclusive, meaning the PEARLs still maintain the right of ingress and egress across these lands during the term of this agreement. That same granting clause limited exclusive rights to certain other things. For instance, EQT has the exclusive right to actually build and maintain the pad itself and the equipment. The PEARLs don't get to go in and do that. So there, that has been effectively rendered irrelevant because of the fence, because the PEARLs do not have ingress and egress across there because of this fence. But the other part of the agreement that neither of you seem to really focus on is it says that, one, they can build fences, ignoring where they are. You don't dispute they can put up fences. I would agree. I would agree there's specific provisions that talk about certain fences, certainly. When they put up those fences, ignoring where they are for just a second, the agreement provides that the surface owners provided with keys to locks in those fences. Now, what's the purpose of them having keys to the locks if it isn't to unlock it and be able to go in and out of that gate? And that's one of the other provisions that we're talking about. So the problem is that hasn't happened. There's no easy way for them to access the east from the eastern side. There is no gate with a lock to allow them to then move cattle and access and move it from east to west. So if we take this in steps, would you concede that at least with respect to access to those parts where there is a gate, that they can go in and out that gate and they can use the lands to graze the cattle in those portions for which there is a gate to provide access? Would I agree that? Okay. So, look, I would agree that if there's certain points where gates are there and they have access, yeah, they would have access, they would be able there. So then what you're saying is that this dispute doesn't come down to the places that they can get to because there's a gate and a key. It comes down to did they put gates in the portions of the fencing-in area that they would need to use to get to that area to graze the cattle or to move the cattle? Well, I think the issue that I have, yes, so in part... Oh, just stop right there for a second. So you agree even with a caveat that I didn't let you get to. So where in the agreement then does it say, once it says it can be fenced, and once it says that if you put in gates, you've got to give them a key, what do you rely upon to say that they had to put in gates in these places that you're now pointing out, that I don't think I read in your brief, that they should have put in gates in other places to provide ready access to that lands? Where do we see that in the agreement? On the first instance, I would disagree initially with what your entire premise was because we don't believe the outer fence should even be there. There are provisions in here. So for instance, paragraph 21 provides that any pipelines that are where cattle should be grazing must be buried or have temporary fencing. Those can only be located within the area that's in that outer fence. So the only reason you would have that provision is if cattle could regularly be there. Cattle cannot regularly be there. The Pearls have testified and have shown how they constructed this outer fence. It does not allow the Pearls to get cattle where you're talking about. Are you talking about the narrowing part? The narrowing part is outside of the fence. Is that a different argument? No, the narrowing part is a consequence of what we believe is their breach in installing this outer fence. The Pearls do not have the access that you think they would have. I don't think they have any access. I don't know what they have access to. So they do not have access to move cattle in this area. Your brief doesn't say that they don't have access. It says it narrows it down and it makes it difficult and inconvenient to move equipment and the capital and the cattle through that narrowing. That's what you've told us. That's a different point, Your Honor. That's a consequence. Well, that's why I'm asking you if that's a different argument. It's a different argument. Okay. That is a consequence of the outer fence. That requires the Pearls to move cattle on their land outside of the fence to get it from the eastern side of the land to the western side of the land. That cannot happen right now. It's not safe. It cannot happen. And the only reason it cannot happen is that the outer fence is there. So first, we don't believe the outer fence should be there, that it's provided under the contract that they can do this. And two, if it was properly followed under the contract and there was an access point, we probably wouldn't be here if cattle could safely be moved across. But cattle cannot be safely moved across. And this was something that was – there was a meeting between the parties in January of 2016 where the Pearls specifically contested this fence, saying the choke point is too severely small. We cannot safely move cattle. I see your time is expiring. I just have a question about the – whether Shannon is – there's support for your argument that Shannon is an intended beneficiary of the contract. He didn't sign the contract. I know he was involved in some discussions. But what language can you point us to in the surface use agreement or elsewhere that would support the argument that he is an intended beneficiary? I understand he was involved and became more involved in the cattle business aspect. So our first premise in that is that the surface use agreement does not complicate that the cattle business would go away, right? So the first – that the cattle business continues. And Joseph Pearl continued that cattle business as well after the surface use agreement. He attempted to, at least. Paragraph 12 of this contract provides that all rights, duties, and liabilities herein benefit and bind surface owner and operator and their respective heirs, successors, and  Shannon Pearl is both an heir and successor to Joseph Pearl. And he took over that 100 percent when his father passed away because his mother could not do it alone. He then took over that entirely. So that's our position as to why we believe he fits into that under the successors provision, Your Honor. Thank you. I see I'm out of time. You'll have your full rebuttal. Thank you, Your Honor. Thank you. We'll hear from counsel, please. May it please the court. My name is Kevin West. I represent Rice Drilling, D., which is a subsidiary of EQT. They are successors in interest to the rights of Equinor and Statoil under the surface use agreement that is issued in this case. We would ask the court to affirm the summary judgment entered by the district court for the reasons that are set forth in Judge Jolson's opinion, as well as for reasons that the district court's decision was correct, not only for those reasons, but for other reasons that we cited in our motion for summary judgment and cited in our briefing before this court. The Pearls have alleged four breaches, all of which are dependent in some part on Exhibit A to the agreement. In order for them to prevail, they need to demonstrate that Exhibit A adds terms to the agreement, which they have not done. The district court correctly... That was what we were trying to get out of Mr. Olmst, and I don't think he ever really got to the ultimate point here. So you agree that Exhibit A is incorporated into the agreement. That's what it says. For informational purposes. I haven't gotten to that. It's incorporated into the agreement in some capacity, right? Yes or no? Yes, Your Honor. All right. So then it goes on to say, but for informational purposes. So what is the value of Exhibit A? It's incorporated, but by the same token, it says it's only for information. So what do we do with it? If you look at the language of the agreement, I think it is for informational purposes. It's a starting point. It's a tool, if you will, to tell the parties the general location of where the well pad is going to be located. And we think that if you look at the terms of the agreement, it's very significant. The fact that the term informational purposes only precedes the part of the agreement with regard to incorporation by reference. So we look at it. So what does it tell us? It tells us approximately where the well pad is going to be. Now, it doesn't tell us exactly, and that's why those terms, that's why it's indicative. One of the reasons it's indicative that Exhibit A is not a part of the agreement. If you look at Exhibit A, it talks about this being the approximate site of the well pad. It does not supply definite terms of pad sites. Locations are subject to change. The elevations are approximate. The district judge here said that it's not part of the agreement. The document says it's made part of the agreement by reference. So what Mr. Onsa is saying, as I understand it, is the district judge went too far by saying we don't even look at it. It's not part of the agreement. We don't look at it. So his position is that goes too far. But he couldn't tell me really what we do do with it. So I'm asking you the same question. And I think that's the key there is it is a... But you seem to be saying it's not part of the agreement. But the agreement says it is part of the agreement. But it's part of the agreement just for informational purposes as the starting point of a general location of where the well pad is going to be located. All right. And where do we look to see that that was the purpose of the incorporation by reference, for the general location of the well pad? What do we look to to find that? I think if you look, for one thing, at the language, as I've said, of the Exhibit A, it talks about, with regard to the language of Exhibit A, pad site locations subject to change. It talks about elevations are approximate. There are several other areas. Those are just examples where it's indicative that this is not a term of the agreement. It's just informationally letting the parties know this is the general location where the well pad is going to be located. Is there a case that you can cite us to that you think most strongly supports your argument? There are three cases, Your Honor. I think two of the cases that we cited, the Transcontinental and the Carnes cases, both Ohio appellate cases, the Carnes case and Ohio Supreme Court case, that talks about the use of the term informational purposes only. In those particular cases, with Transcontinental, there was the name of an owner listed on an agreement for informational purposes only. The court determined that doesn't make that person a party to the agreement. Were those documents, that issue, sort of incorporated by reference as well? Yes, Your Honor. And the same with regard to there was an employee handbook for informational purposes only in the Carnes case. But if you look at Carnes, unless I'm mistaken, Carnes basically says that if you provide somebody a handbook and you say it's for informational purposes, that doesn't constitute a contract. Here you have a contract. You have the surface use agreement. And so now we're trying to figure out whether the same rule as in Carnes where there wasn't a contract would apply when there is a contract. So how do you address that? Well, Your Honor, I think if you look at the Volovets case, which is cited by the appellants in their brief, which is also an Ohio case that relies on a case from this court, the Reinerd case, this court decided in 1992, it talks about when you're going to incorporate a document by reference, the intent must be clear and unequivocal. And in this particular instance, if you look at the only time that Exhibit A is mentioned in the surface use agreement, it's mentioned one time. And in that particular instance, as I've noted, the informational purposes only part precedes the part of incorporation by reference. Did any of these other cases find that, you know, the order of those clauses to be determinative? It doesn't, but looking at it as a rule of contract construction, I think that that is relevant in determining what the parties to this agreement meant. So and certainly under Volovets and under Reinerd decided by this court, the terms incorporating a document by reference need to be clear and unequivocal. That's certainly not the case here where you have that language, informational purposes only, and then you look to the exhibit where in the actual exhibit there is language that indicates that these are, you know, these are not definitive terms. This is, you know, just an approximation of where the well pad's going to be. So would it be fair to say, and this is my words now, not yours, but just tell me if I'm close. You're basically saying that when Rice prepared this plat and they attached it and said it was for informational purposes, what they were telling the other side is this is what our present intention is. This is what we're thinking we're going to do, but we're not bound by it. Correct, Your Honor. Is that it? It is, Your Honor. Okay. And if you look at the other terms of the surface use agreement, quite frankly, it's a very broad agreement. It could be interpreted as allowing, in this case, Equinor is the one that built the pad, Rice is acceded to their rights by means of an assignment, but it gives them rights to use any of the 146 acres that are covered by the surface use agreement. So there were arguments made also with regard to the use that if you look at the particular plat on Exhibit A, it covered 14 acres. In essence, in reality, only 12 acres were used. So I think that also goes to the fact that that was an approximation, that was a starting point for the parties, and it wasn't part of the agreement. The other thing I wondered about, and I didn't get to the time to get to it with Mr. Onst, but I was interested to see that after all of this dust settles, the parties then negotiated out of the obligation to build this eight acre pasturage area and paid $160,000 just so they didn't have to fence in that pasture area, which is more than they were paying per acre for the 10 acres or so that they're actually using. So what is the significance of the fact that they were going to put in a pasture area, which seems to me to mean that's where they all thought the cattle were going to be? And then you bought them out of that, out of your obligation to do that. Well, I think that if you look at the issue with regard to the area for grazing, that's actually covered by the text of the agreement. That is, I believe, that is in paragraph 20 of the agreement. That's not something that's in Exhibit A. So certainly that is something that there's no dispute. That was something that was included within the terms of the agreement. But what does that have to do, what is the relationship of that, if anything, to the argument that they're currently making, that they were basically able to take these cattle and associated equipment anywhere on this property except for the pad itself? They could take it, they could take these cattle unencumbered anywhere on the remaining, what is it, 130 acres? And they could. I mean, that's why you had the locks in the gate. They had access. They make a claim that they were denied access. They have access. That's why you have this provision with regard to the locks in the gate. Did they ever ask you to put gates in areas and give them the key in areas that he was saying this morning is not accessible because there weren't gates? I don't think that there's anything in the record on that one way or the other, Your Honor, with regard to the gates. I know that there are issues that have been raised with regard to that, but I don't think there's anything. Well, what the heck? We're here to sort of make a deal. Would you be willing to give them, to put some gates in, let them get access to places they can't get access to? I believe, we've had discussions, and not to go beyond the record of this court, we've had discussions in the last several weeks about their access and have said that they do have access through gates to go across the premises. And if they think that's not sufficient and they want some more gates, will you put in some more gates? I can't make that commitment. Here, Your Honor.  Just thought I'd try. I will say, before I run out of time, though, but even if the court were to determine that they thought that Exhibit A had some relevance to the agreement, or if the court thought that there was some violation of one of the terms within the text of the agreement in addition to something in Exhibit A, there was not any proof in the court below with regard to damages. There was no proof that any of these alleged breaches that have been raised by Ms. Pearl and Shannon Pearl, and if I have time, I'll get to why we think Shannon Pearl is not even an intended beneficiary of this agreement. But if you look at that, there's been no proof at all with regard to damages. And so, even if this court were to determine that the appellants are correct and Exhibit A has some relevance and there's been some violation of some of the terms of either the text of the surface use agreement or Exhibit A, the district court never got to that. But if it had, there was certainly sufficient evidence in the record, as we argued in our motion for summary judgment and as we've argued in our brief before this court, that they can't prove damages. You know, as we talk about what's relevant and what's not, is there a significant difference between sort of the temporary and permanent fencing issue? The Pearls argue that the agreement only grants permission to construct temporary fencing and that permanent fencing has been constructed. I mean, what are we to make of that? And I think that goes to some extent to what I was just arguing. We don't think there's any difference. I mean, a fence is a fence. To the extent a fence is permanent and at the end of the use of the well pad, at the end of the use of the surface agreement, there is an obligation, would be an obligation, whether it's a permanent fence or a silt fence, for EQT to remove those fences. We're not here yet. Any issues with regard to reclamation of the property are premature. But even if the court found that there was a distinction between permanent fencing and the silt fencing, the temporary, more temporary fencing, they've not shown any damages that have occurred as a result of there being a different kind of fencing. So for that reason, we would submit that even if the court did not affirm, based upon the opinion of Judge Jolson and the court below, that it could do so on the alternative grounds that damages have not been demonstrated. And on this fence question, your view, correct me if I'm wrong, is all the contract required was conferring with the Pearls and you guys did that? You didn't have to get their permission about where the fence would go? And I think that's, yes, your honor, I think that is true. And I think that if you look at the language of the agreement, it actually, I think it's paragraph 15, actually talks about conferral, consultation rather than approval. All you got to do is consult. And even if they say no, we consulted and we'll go ahead and build it where we want. I mean, that's your reading? It is, your honor. And I think that the proof in the court below was that that consultation did occur, that with regard to the exact fence, I think that Mr. Shannon Pearl admitted that there was a meeting where the location of that fence was discussed. Counsel, thank you for your argument. We'll hear rebuttal. Thank you, your honors. Judge McKeague, I apologize if I didn't get to your question on the informational purposes only. I thought I had with the... You got to it. I just don't think he answered it. Okay. Well, I hope to answer it now.  He says it's not relevant at all. You say it is relevant and it's binding, but it's for informational purposes. So what is the significance in just simple language? So if you look at, let's start with paragraph 16 says pad site to be fenced. That's very simple. It's one of the shortest things you probably could write in a contract, pad site to be fenced. Nowhere within any portion of this document other than exhibit A is a pad site discussed in any sort of definition. What does that mean? If I go to exhibit A and if I'm the Pearls and I'm negotiating this and I go to exhibit A, I see it says pad well site, pad area, 3.2 acres. That provision when read with exhibit A would tell me that the pad site, the 3.2 acre pad site would be fenced. That's an affirmative right of fencing that would be done. If you take this away and it means nothing, paragraph 15 has no meaning. What does that mean? Now, the other thing I would point out, Your Honor, is... So you're saying it is binding. I believe exhibit A does have binding effect. Absolutely. Now, can they modify it? We have never taken the position that the footprint, so to speak, couldn't ever be modified. For instance, and we asked Equinor this during depositions and they agreed with our interpretation with exhibit A. Brett Docter specifically testified, this is in 561 of the record, I asked him, but looking here at exhibit A, can you tell me what is the purpose of exhibit A to the surface use agreement? He answered the purpose is to define the area covered by the surface use agreement. He doesn't say it's for informational purposes only, it's we can guess and all this. But we're also agreeing that reality is on the ground if they need to come in and shift part of this because how the ground looks, they can do that. But, Your Honor, what I heard during opposing counsel's discussion is you put informational purposes in and then have an and clause and it's made a part here of, it's incorporated by reference, it still means nothing to us and it can't be there, Your Honor, because it does define things such as the pad area. How much is that pad area going to be? The installing the gates, Your Honor, I wouldn't bring it up generally because, you know, settlement discussions may be had, but yes, gates have been asked for throughout and this has been the contention throughout. Shannon Pearl had testified about not having access and if he could have access into that area, into the pad area, that they could move cattle and we wouldn't be here. Now, Mr. West may be at a disadvantage because he was counsel, he's counsel for Equinor and he came on after the fact. But Equinor's position during all of that testimony was, no, no, no, we cannot give you access because we're not allowed to for OD and R regulations, Ohio Department of Natural Resources. That's what they were saying below to the district court that, no, no, no, we are not allowed to give you access. That's not true. We know that's not true. And if access were given, we wouldn't be here. I thought their argument about complying with the Ohio reclamation provisions was they couldn't move the fence where you wanted it to because it would go right over the top of the soil pile and then they couldn't protect the soil pile. At least that's what the briefs seem to say. They said they had to keep it fenced in and our client couldn't have access to that. Your Honor, they have never been willing to give access to that location for purposes of moving cattle. There is nothing in the record saying we would happily allow them to move cattle all they want to get across there and to go to where the cattle can graze. Well, the cattle can't move across the soil pile, can they? The soil pile, Your Honor, is not a pile of soil. And there's pictures in the record, Your Honor, it is a flat piece of property where they dumped the top soil and they dumped a bunch of rocks on top of it. It is not some big pile that's like an inclined mountain or hill. That's not true. It is a flat ground. The cattle could easily move from the east to the west to get out to the pasture land on the western side outside the fence. That could easily happen if a gate were installed on the east side, Your Honor. As to the temporary, or excuse me, the paragraph 8 conferring, I don't agree that it was clear that Shannon Pearl said that they conferred. There was no conferring. Brett Docter testified, Your Honor, in this case that there was no, to his knowledge, there's not a document saying they ever met about this fence as it's constructed or that they ever staked it or anything with the Pearls. Shannon Pearl testified that the parties had meetings about temporary fencing that would go up during, I apologize, Your Honor. No, no, I mean. During construction activities. Same question that Judge Cole had about whether that makes a difference and why. I don't believe it does because, well, it does for purposes of temporary versus permanent. I believe there's a difference between a temporary fence and a permanent fence. To me, a permanent fence is a fence that's going to go in and be maintained throughout their operations, throughout the life of the SUA, the Surface Use Agreement. Temporary fencing is things like putting that temporary fence up while the cattle are grazing around pipelines. That provision is specifically in this contract that says if your cattle are going to be grazing where you have pipelines, you have the option of burying those pipelines to protect the cattle or putting up temporary fencing. Temporary fencing should have been put up in this area if they wanted to for purposes of construction. And I would point to, Your Honor, another issue with temporary fencing is, this is at 37-4. This was notes that Equinor had for the January 2016 meeting where Equinor noted that Mr. Pearl, this being Joseph Pearl, discussed about the fact that he had to keep his cattle out of this area during construction operations and that they were going to put temporary fencing up to protect. So I think there is absolutely a difference between permanent and temporary fencing. Your time's expired. Any further questions? Okay, thank you. I think we understand the argument and thank you both for your arguments. The case will be submitted and we can call the next case.